## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. CR-11-205-JAW |
| | ) | |
| KELVIN MALLY, | ) | |
| | ) | |
| Defendant. | ) | |

### DEFENDANT'S SENTENCING MEMORANDUM

NOW COMES Defendant, Kelvin Mally, by and through counsel, David W. Bate, and offers the following memorandum in aid of sentencing.

### Kelvin was government's "last picked" fruit for a reason

The § 3B1.3 minor role analysis and § 3553(a)(6) mandate for consistent sentencing among similar defendants are inextricably intertwined for Kelvin, as they are in many drug conspiracy cases.  This case is unique, however, because Kelvin turned out to be a prosecutorial afterthought: The Government arrested him, at his family home, after all his more culpable co-defendants had either cooperated or defended and lost at trial.  In fact, Kelvin's arrest is not noted in this matter until Document 526, which is well down the docket, even in a drug conspiracy, for a non-absconding defendant residing in plain sight.  The government waited because Kelvin was not important to their prosecution.

The government's delay not only eliminated Kelvin's ability to cooperate and avoid the 5 year mandatory minimum.  The government's delay left Kelvin at the mercy of more culpable cooperators, some of whom were the very older siblings and trusted family friends who drew Kelvin, barely an adult, toward the conspiracy in the first place.

-2-

Mr. Mally's co-defendants and related defendants cases can be summarized as follows:

| Defendant/Sentence | Involvement |
|---|---|
| Manuel Trinidad-Acosta<br>1:11CR00205-001<br><br>240m, 4y TSR | According to government's sentencing memo (Doc. 480):<br>Organizer by virtue of maintaining a premises enhancement.<br>Involved in conspiracy for 14 mos., compared to Kelvin's 2-3 months.<br>Declined to cooperate. |
| Ed Cogswell<br>1:11CR00205-008<br><br>180 m, 5 y TSR | "Robert Jordan testified that Cogswell was a member of the conspiracy from its beginning." Gov Sent Memo at 8 (Doc 508)<br>Keith Lewis testified that Cogswell was buying 10-20 packs of crack cocaine every day or every other day.  Id.<br>The government alleged Cogswell obstructed justice by sending a witness an apparent death threat.  Id. at 9.<br>Cogswell made cash deposits, so trusted member of the conspiracy.  Id. at 11. |
| Christopher Mullins<br>1:12CR00008-001<br><br>140 m, 5 y TSR | "the defendant described himself as a user and a runner of drugs who had four or five customers he dealt with daily.  Mullins admitted buying $50,000 worth of crack cocaine from the conspirators during the period from November 2011 through January 2011. Mullins told Gardner that his drug transactions with the conspirators slowed down between January and June 2011, but that they picked up again in June and he was "busy" until October 2011."<br>Gov. sent memo at 5 (Doc. 75).<br>"Mullins joined the conspiracy not later than June 2011 and obtained drugs for others and for his own use." Gov sent memo at 8 (Doc. 75). |

-3-

| | |
|---|---|
| Dawlin Cabrera<br>1:11CR00205-004<br><br>  120m, 5y TSR,<br>12/3/14 pro se mtn<br>reduce sentencing<br>pending | The Boss, by most accounts, although he denies it at his proffer, starting p2630.<br>Proffitt, 11/14/11 proffer, P2464, Cabrera did not like to get his hands dirty.<br>Proffitt, 2/22/12 proffer, p2590: Cabrera in charge with Nunez and acted like he had power over the group.<br>Alfarabick Mally proffer, Cabrera's brother was giving away product in Maine and asked Nunez and Trinidad Acosta to help out.  p2842.<br>Cabrera told Trinidad-Acosta the bank account numbers for the money deposits.  Cabrera purchased drugs in NYC to be brought to Maine. P2844.<br>Keith Lewis told police that Cabrera was the boss.  Cabrera had assaulted and even threatened to kill Lewis over a drug debt. P134. |
| Kizzy Fader<br>1:12CR00007-001<br><br>  120 m, 5 y TSR | Fader "assisted Ed Cogswell in selling crack cocaine supplied by the Ohio Street organization for approximately six months before the defendant's arrest on August 9, 2011. Trial testimony established that the defendant continued to conduct transactions with the conspirators at Ohio Street after her arrest and at a time when she was purportedly cooperating with the police. She assisted the conspirators to recover and secret a quantity of crack cocaine that was described as substantially similar to the quantity of crack cocaine, 368 grams, seized by the police. The testimony establishing such facts came from the first-hand knowledge of individuals participating in the conspiracy."  Gov. Sent. Memo at 3, 1:12-CR-00007-JAW (Doc. 89)<br>Numerous criminal convictions and probation violations.  Id. at 5. |
| Jowenky Nuñez<br>aka "Bullet"<br>1:11CR00205-006<br><br>  97m, 5y TSR | Nunez admitted coming to Maine to assist Cabrera in December, 2011.  Nunez PSR, ¶3.<br>Went in 50/50 with Cabrera.  Proffitt 2/22/12 proffer report, p2591<br>Relevant conduct: 4.9 kg cocaine base.  Nunez PSR ¶13.  Cf. 1.75 kg cocaine base Kelvin Mally's PSR, ¶10 attributes to him (which is over-inclusive but not contested as set forth below).<br>Supervisor and co-owner of organization. |

DAVID W. BATE • ATTORNEY AT LAW
15 Columbia Street • Suite 301 • Bangor, Maine 04401
Tel: (207) 945-3233 • Fax: (207) 433-7169 • Email: davebate@gwi.net

-4-

| | |
|---|---|
| <u>Alfarabick Mally</u><br>aka Jacob Garcia<br>1:11CR00205-002 | Admits starting coming to Maine in 12/10. P2842. |
| 84m, 5y TSR | Proffitt 2/24/12 proffer report (Alfarabick Mally brought drugs up just before the 11/11 raid).<br>"Jordan testified that after the crack was prepared in New York, he would watch [Alfarabick] Mally get on a bus in New York and then Jordan and others would pick [Alfarabick] Mally up at the bus station in Bangor."  Gov Sent Memo re Alfarabick Mally, at 1 (Doc. 444). According to Bo Lewis, Alfarabick was "second in command to Nunez."  <u>Id.</u> |
| <u>Robert Jordan, Jr.</u><br>1:12CR00004-001 | Gov. Sentencing Memo, p1: "Robert Jordan testified that his job in the conspiracy was to 'baby sit' Keith Lewis and to collect the money from sales made by Lewis."  Jordan was "responsible for the proceeds collected by the conspiracy." Doc. 480. |
| 60m | Robert Jordan, Jr. is the son of a police officer and apparently exploited that fact for street credibility, according to Keith Lewis. |
| <u>Abraham Lluberes</u><br>1:11CR00205-007 | <u>Lluberes perhaps best comparison for Kelvin,<br>even though more involved</u> |
| 60m, 5y TSR<br>R 35 reduct. to 50m<br>following testimony<br>against Kelvin | Doc 404 Gov mtn for downward departure.<br>Report of 6/18/12 proffer: Lluberes came to US in 5/10.<br>Proffitt 2/24/12 proffer report:<br>Lluberes brought all the drugs to her residence with Trinidad-Acosta the day of the raid. P2589.  Lluberes came to Maine mid-summer, 2011. P2591.<br>Lluberes always answered the door with a gun and had a gun on him all the time. P2593.<br>Lluberes in charge of the cash when Cabrera or Nunez were not around. P2595<br>Lluberes's handwriting on many of the drug ledgers.  P2596-97.<br>A firearm was recovered from Lluberes's bedroom.  P2739 (Agt. Renzullo Gr. J. test at 13)<br>Lluberes obviously possessed the .40 handgun recovered from Siverly's apartment next door the day after the raid.  Given that Lluberes always had a gun, that .40 probably was his gun, not Kelvin's. |

-5-

| | |
|---|---|
| <u>Keith Lewis</u><br>1:13CR00141-001<br><br>  48m, 3y TSR | Motion for downward departure based on sealed letter (Doc. 19).  No sentencing memoranda filed.<br><br>Cabrera and crew used his residence to sell crack.  P134.<br>On p1 of discovery with police contact on 10/27/10 regarding this investigation, compared to Kelvin's involvement starting August, 2011. |
| <u>Pauline Rossignol</u><br>1:11CR00205-003<br><br>  46m, 3y TSR | Rossignol "was a <u>critical distributor</u> of crack cocaine to the customers in the Bangor area. Numerous co-conspirators identified her as one of the biggest customers of the conspiracy. Her involvement in the conspiracy was longstanding and critical to the success of the conspiracy." Gov sent memo at 5-6 (Doc. 603).  She "set up 250 deals in the June to November 2011 period." <u>Id.</u> at 6.<br><br>By comparison, Kelvin's role not "critical." |
| <u>Pari Proffitt</u><br>1:13CR00082-001<br><br>  280d, 3y TSR,<br>R. 35 motion pending(?) | Deeply ensconced in conspiracy as Trinidad-Acosta's girlfriend.  Benefitted hugely from cooperation.<br>Lied during testimony in prior cases about furnishing crack to Holmes. |
| <u>Jennifer Holmes</u><br>1:12CR00006-001<br><br>  366d, 3y TSR | Crack addict and convicted false statement re purchase of firearm. |
| <u>Luis Gonzalez</u><br>1:11CR00205-005<br><br>  Dismissed | Dismissed despite apparent 4/14 and 5/4/11 controlled purchase from Gonzalez and Trinidad Acosta. Pp171, 195.  Alias, "Animal." P2462 "Proffitt stated "Animal" (Luis Gonzales) had only been in Maine for four days in April of 2011. She stated she thought they brought him up here to get him off Percocet. She stated he appeared to be withdrawing and they started to get freaked out and wanted to take him to the hospital. Proffitt stated she didn't think he was really part of the group, because he didn't get paid and went back to New York City. She stated she believed he was part of the organization in New York City. He did stay at the Ohio Street apartment when he was in Bangor." Pp2591-92. |

DAVID W. BATE • ATTORNEY AT LAW
15 Columbia Street • Suite 301 • Bangor, Maine 04401
Tel: (207) 945-3233 • Fax: (207) 433-7169 • Email: davebate@gwi.net

-6-

| Jonathan Cabrera | Involved, according to Proffitt, p2455, but not charged.  Minor role, on par with Kelvin's. |
| Not charged | Proffitt 11/14/11 proffer report, p2464 (Jonathan would transport drugs up to Maine) Jonathan was giving away product, per Alfarabick Mally, p2842. |

Perhaps the best, conservative comparison for "similar conduct" analysis is Lluberes, but even he joined the conspiracy a month or two prior to Kelvin and appeared to earn a more trusted place within the organization. When selling drugs at the residence, according to Proffitt, Lluberes answered the door carrying the gun that never left his side.  Lluberes was in charge of the cash when Cabrera and Nunez were absent.  Lluberes drove for the organization.  Lluberes found himself quickly lawyered-up and wisely took advantage of the opportunity to cooperate, thus avoiding not only a mandatory, consecutive 5 years on a gun charge but the 5 year mandatory minimum for the § 841(b)(1)(B) conspiracy.  See Amended Judgment (10/21/14, Doc. 788) (Rule 35(b) sentence reduction from 60 months (3/25/13, Doc. 419) to 50 months).  Lluberes may enjoy further reductions pursuant to the Court's Sua Sponte Motion for Sentence Modification and Scheduling Order for Sentence Modification as to Abraham Lluberes (1/28/15, Doc. 834).  The comparison of Lluberes's 50 months to Kelvin's PSR range of 151-188 months jars the conscience.

Kelvin Mally cannot escape the 5 year minimum sentence here because he did not have the advantage of counsel when his cooperation would have been of benefit to the government.  This was due purely to the government's delay in arresting him.  Unlike Lluberes, Kelvin cannot look forward to an opportunity for a sentence even lower than 50 months even though his

-7-

involvement is several degrees lower than Lluberes in terms of duration and seriousness.

Respectfully, Kelvin's role did not include "transport[ing] cocaine base from New York to Bangor, Maine.," as suggested by PSR ¶8. See Discovery p2847 (Alfarabick Mally admitting he and Lluberes brought up drugs) (Exhibit 3); Proffitt 11/14/11 proffer report, p2464 ("Usually Garcia or Jonathan Cabrera or Chickie-Lee would be the person who would transport the drugs up."); Proffitt 2/24/12 proffer report (Alfarabick Mally brought drugs up just before the 11/11 raid); Government Sentencing Memo for Alfarabick Mally, at 3, 4 n.3 (Doc. 444) (Alfarabick Mally "admitted making 12 to 13 trips from New York to Bangor, seven or eight of which were to deliver drugs" and "Dawlin Cabrera testified that [Alfarabick] Mally made most of the deliveries from New York to Bangor"). The Draft PSR conclusion that Kelvin "made four runs (July 2011 to October 2011) from New York to Maine to replenish the supply," ¶8, is an apparent confusion of "Mally" references (Kelvin for Alfarabick) and is directly contradicted by the statement by Proffitt, a key government witness in this conspiracy prosecution, that Kelvin was in Maine no earlier than late August, 2011, see p2591 (Exhibit 4).  Transportation of drugs also would be much more serious than Proffitt's description of Kelvin as having a "pretty low-ranking role."

There is no dispute at sentencing that Kelvin came from New York City to Maine to join his half-brothers after they had established themselves within the conspiracy, so it is practically a necessary inference that his older brothers and de facto uncle, Dawlin Cabrera, see Drob letter regarding

DAVID W. BATE • ATTORNEY AT LAW
15 Columbia Street • Suite 301 • Bangor, Maine 04401
Tel: (207) 945-3233 • Fax: (207) 433-7169 • Email: davebate@gwi.net

-8-

Cabrera influence,[1] not only made this opportunity available but failed to give him proper guidance.  It is likely that they advised Kelvin to join the conspiracy, see id.  Were it not for his immature judgment and lack of guidance, Kelvin likely would have been able to avoid involvement in the conspiracy.  To the extent he was involved, his role was minor if not minimal.  See Pari Proffitt testimony, Mullins trial (Kelvin had a "pretty low-ranking role").

There is no evidence that Kelvin organized or had the ability to organize this conspiracy.  Kelvin's involvement certainly cannot compare to his siblings, Alfarabick and Jowenky, or to a "critical distributor" of crack cocaine like Rossignol.  It is incongruent and, therefore, unjust that Kelvin's sentence might be comparable to theirs (Jowenky, 97 mos.; Alfarabick, 84 mos.; Rossignol, 46 mos.).  There is little question that Kelvin is "less culpable than most other participants," thus qualifying him for at least a 2 level reduction under § 3B1.3, as well as an additional 3 level reduction under § 2D1.1(a)(5) because Kelvin's base offense level is 32.[2]

**Age**

Kelvin turned 18 on May 11, 2011.  By the time Proffitt claims Kelvin came to Maine to assist the conspiracy, he was still younger than about

---

1 Counsel provided Dr. Drob's reports to the Court and the government as part of the PSR review process.
2 Section 2D1.1(a)(5) directs the offense level for drug cases with mitigating roles be reduced below that listed in the Drug Table:

> the offense level specified in the Drug Quantity Table set forth in subsection (c), except that if (A) the defendant receives an adjustment under §3B1.2 (Mitigating Role); and (B) the base offense level under subsection (c) is (i) level **32**, decrease by **2** levels ….

(Emphasis added.)

DAVID W. BATE • ATTORNEY AT LAW
15 Columbia Street • Suite 301 • Bangor, Maine 04401
Tel: (207) 945-3233 • Fax: (207) 433-7169 • Email: davebate@gwi.net

half of the member of a high school graduating class.  Kelvin is learning disabled and never graduated from high school, <u>see</u> Drob report, but he is working on his GED at the Somerset Jail.  Kelvin's very young age for an adult crime and lack of insight are mitigating factors under § 3553(a)(1) and grounds for departure under § 5H1.1 ("Age (including youth) may be relevant in determining whether a departure is warranted").  <u>See</u> Drob Competency Report, p. 7 ("The defendant's level of insight and judgment regarding his alleged offense behavior and his life in general is limited. This appears to be a function of immaturity and dependency coupled with a lack of intellectual capacity."), p.12 ("These natural maturational factors, along with the defendant's environmental, cognitive, emotional and personality characteristics made him particularly subject to the negative influence of others and a failure to exercise good reason and judgment in evaluating the potential consequences of his conduct.")

**Lack of Guidance as a Youth**

Although lack of guidance as a youth generally is not a grounds for departure, § 5H1.12, First Circuit case law suggests that such considerations are relevant to sentencing if present to an atypical degree, <u>United States v. Holmes</u>, 112 Fed. Appx. 72, 74 (1st Cir. 2004),[3] as reflected in Dr. Drob's report.

---

3 The First Circuit concluded in <u>Holmes</u> as follows:

> Appellant argues that his case is different because of his difficult and abusive family history and his long history of substance abuse and drug addiction, without prior counseling or treatment. However, "drug addiction [and] a troubled childhood … do not constitute permissible bases for departing below the [guideline sentencing range]. See <u>U.S.S.G. §§ 5H.4</u>; 5H1.12." <u>Mayes</u>, 332 F.3d at 37 n.4. In a nutshell, the circumstances of this case do not "indicate the existence of meaningfully atypical rehabilitation." <u>Sklar</u>, 920 F.2d at 117.

DAVID W. BATE • ATTORNEY AT LAW
15 Columbia Street • Suite 301 • Bangor, Maine 04401
Tel: (207) 945-3233 • Fax: (207) 433-7169 • Email: davebate@gwi.net

-10-

> Mr. Mally reports a history of financial deprivation and family
> conflicts in his childhood.  He states that his father used to
> drink heavily and argue with his mother for long periods.
> The same scenario was repeated between Mr. Mally's mother and
> his stepfather. Mr. Mally indicates that at one point during
> a fight between Ms. Perez and Mr. Batista, his mother injured
> his stepfather with a knife. Mr. Mally states that the family
> has gone hungry many times as most of his brothers are in jail
> and the family income is now very low. … The chaotic and
> antisocial family context in which he was raised
> appears to be a major factor in Mr. Mally's emotional and
> personality dysfunction.

Drob Competency Report at 12.

### Not compensated

There is no evidence to undersigned counsel's recollection that
Kelvin was paid money for his role in the conspiracy.  He apparently
received food and shelter at the 100 Ohio Street residence and the comfort
and companionship of his brothers and "uncle," Dawlin Cabrera.  See § 5H1.9
("The degree to which a defendant depends on criminal activity for a
livelihood is relevant in determining the appropriate sentence.").  The
lack of overt compensation is relevant not only under § 5H1.9 but also as
an indication of Kelvin's low ranking role within the conspiracy.

### Did not possess firearm

The jury found Kelvin not guilty of possessing the firearm but the
PSR ¶17 recommends that the firearm enhancement apply.  Although the
acquittal would not absolutely bar a gun possession enhancement due to the
differing standards of proof at trial and sentencing, the evidence
presented to the jury was conflicting and so uncertain that the Court may
consider it inappropriate to second guess the jury's verdict.

Discovery does not support the government's contention that Kelvin
possessed a firearm as charged.  For example, "[Alfarabick] Mally

described the guns located in the residence. He stated the .380 was given to Cabrera by Cogswell.  The.40 that was found in Siverly's apartment was bought for Cabrera by "Jen" (Jennifer Holmes) because he told Jen he needed a gun.  The 9 mm that was in Trinidad-Acosta's residence belonged to Trinidad-Acosta and was purchased by Jen as well.  … [Alfarabick] Mally stated that he doesn't believe his Kelvin has a gun and can't imagine him with a gun.  Kelvin is afraid of guns."  p.2847.

Moreover, the Smith & Wesson .40 charged to Kelvin by the Grand Jury and the PSR (but not the jury) was discovered in the days after the raid in Siverly's apartment next door, which was connected to the conspiracy's apartment by a secret passage in the attic.  At the time of the raid, Kelvin was not present at the residence and, therefore, not possessing the firearm as it went from one apartment to the next.  More likely, Lluberes used that firearm on a daily basis and carried it with him everywhere, as described by Proffitt.  Finally, there is a conflict in discovery as to whether Kelvin ever received the firearm.

**Mental health**

Under § 5H1.3, "Mental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines."

Dr. Drob's competency report concludes,

Dr. Drob, Competency at 11: The results of psychological assessment indicate that Mr. Mally is a multiply handicapped defendant who shows evidence of well below-average (though not intellectually deficient) cognitive functioning, learning disabilities and academic deficits, inadequate language

-12-

> development, a serious mood (depressive) disorder, clinically
> significant symptoms of anxiety (including separation anxiety
> with respect to his mother and sister), and a severe personality
> disorder with Dependent, Borderline and passive-Aggressive
> features."

Id. at 11.

The language, "in combination with other offender characteristics,"
§ 5H1.3, brings together all of Kelvin's Guidelines considerations such
as age, lack of guidance as a youth, lack of compensation, etc. to be
considered along with his mental health.   In that context, Kelvin's case
is atypical and deserves a downward departure under the Guidelines.

**Late arrest deprived Kelvin of meaningful opportunity to cooperate**

During the presentence conference, the Court suggested that Kelvin's
late arrest and delay in acquiring legal counsel implicates the type of
Sixth Amendment protections discussed in Missouri v. Frye, 132 S. Ct. 1399
(2012).   That case holds that a criminal defendant's right to effective
assistance of counsel necessarily includes the right to timely notice of
all plea offers communicated by the prosecution to defense counsel.   The
Supreme Court concluded that plea negotiations were a "critical stage" of
criminal proceedings because

> Ninety-seven percent of federal convictions and ninety-four
> percent of state convictions are the result of guilty pleas.
> … The reality is that plea bargains have become so central to
> the administration of the criminal justice system that defense
> counsel have responsibilities in the plea bargain process,
> responsibilities that must be met to render the adequate
> assistance of counsel that the Sixth Amendment requires in the
> criminal process at critical stages. Because ours "is for the
> most part a system of pleas, not a system of trials," … it is
> insufficient simply to point to the guarantee of a fair trial
> as a backstop that inoculates any errors in the pretrial
> process. "To a large extent . . . horse trading [between
> prosecutor and defense counsel] determines who goes to jail and
> for how long. That is what plea bargaining is. It is not some
> adjunct to the criminal justice system; it is the criminal

-13-

justice system."

Id. at 1407 (citations omitted, emphasis in orig.).

Inherent in Frye's Sixth Amendment protection, in the federal prosecutorial model of rampant defendant cooperation, is the notion that that federal plea negotiations in drug cases almost always include the chance to "work off" part of a sentence through proffer and cooperation. Kelvin, however, did not have legal counsel until August 28, 2013.  By that time, all of his co-defendants either were post-conviction following trial or pending disposition following cooperation.  Although there is no suggestion that the government's delay in arresting Kelvin was an attempt to forestall appointment of counsel and prevent him from helping himself through cooperation, it had that exact effect.  As a result, Kelvin was deprived of the cooperation corollary to Frye's effective assistance of counsel.

Ironically, Kelvin not only did not get the chance to cooperate, he somehow became exposed as a cooperator, so he faced a cooperator's risk with none of the benefits.  According to Alfarabick Mally's March 30, 2012 statement, Cabrera thought Kelvin was cooperating:

> [Alfarabick] Mally stated that Kelvin Mally is his little brother.  Mally stated that he doesn't believe his Kelvin has a gun and can't imagine him with a gun. Kelvin is afraid of guns. Kelvin is scared right now and hiding out. Cabrera told Kelvin that if he told on him he would hurt Kelvin's family. Cabrera thinks that Kelvin snitched on him. Cabrera sent his brother to hurt Kelvin, so Kelvin is scared and hiding out. Cabrera told Mally in jail not to worry about his brother, because he knows what he did.

**Acceptance of Responsibility**

To the government's credit, partially in recognition of the arrest chronology by counsel's recollection, the government offered to dismiss

-14-

Kelvin's drug conspiracy count in return for the mandatory 5 year sentence on the firearm count.  Kelvin declined the plea offer because he would not plead guilty to a firearms charge, even when counsel explained that Kelvin's request for a plea offer involving drugs would carry a much higher Guidelines sentence and much more uncertainty regarding the ultimate sentence imposed by this Court.  Kelvin apparently could not grasp the significant benefit of the plea offer, which precipitated counsel's request for the competency evaluation.  Dr. Drob found Kelvin to be competent but outlined numerous deficits that explained his inability to sort through the government's offer.

Kelvin was acquitted of the firearms charge to which he refused to plead and was convicted of the drug charge he would have taken for 5 years. That may not be textbook acceptance of responsibility, but refusal to plead to the charge for which he was acquitted has some important acceptance components involved and deserves some consideration at sentencing.

**Drug quantity**

Counsel originally objected to the drug quantity and corresponding offense level calculations in the draft PSR.  Although the defense still considers the drug calculation in the PSR somewhat elevated, a re-calculated relevant conduct would not change the offense level, so that objection is withdrawn.

**Criminal History**

Kelvin objected to the single criminal history point assessed in the PSR because it appears that the listed offense was a diverted juvenile adjudication.  Probation responded with an interesting technical argument involving New York law that overlooks the theme of § 4A1.2(f), which seems

-15-

to be that these types of diverted adjudications for juveniles should not be counted.  This offense involves a single criminal history point under the Guidelines and does not affect the advisory Guidelines range.  Kelvin trusts the Court will assign proper weight to the adjudication.

**Recommended advisory Guidelines range**

Kelvin respectfully requests that the Court reduce his Guidelines total offense level by 7 levels as follows:

```
2   Mitigating role
3   § 2D1.1(a)(5)
2   No firearms enhancement
7
```

This would result in a corrected total offense level of 27.  At criminal history category I, the advisory Guidelines sentencing range to be considered by the Court should be 70-87 months.

**Section 3553 sentence**

The Court has considerable discretion imposing a fair and just sentence within the statutory range of 5 to 40 years.  Considering the factors of Kelvin's minor role, his young age, challenges growing up, mental health, and lack of compensation, and comparing those to the conduct of co-defendants, it is difficult to justify a sentence greater than his older brothers who were here longer and more deeply involved.  Even if the Court were to choose Lluberes as a reference, Lluberes was involved longer and deeper.  Compared to Lluberes, Kelvin did not carry a weapon for drug deals or handle the cash when the organizers were not present.  Lluberes is serving 50 months, perhaps less after consideration of the Court's recent Motion.

DAVID W. BATE • ATTORNEY AT LAW
15 Columbia Street • Suite 301 • Bangor, Maine 04401
Tel: (207) 945-3233 • Fax: (207) 433-7169 • Email: davebate@gwi.net

-16-

WHEREFORE, Kelvin Mally requests a sentence at or near the 5 year statutory minimum sentence.

Dated in Bangor, Maine this 3rd day of February, 2015.

/s/_____
David W. Bate
Attorney for Defendant
Fed. Bar No. 2096
15 Columbia Street, Suite 301
Bangor, Maine  04401
(207) 945-3233
davebate@gwi.net

-17-

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the above date, I electronically filed this
pleading with the Clerk of Court using the CM/ECF system which will send
notification of such filing(s) to the following:

     AUSA Donald Fieth, Esq.

                              <u>/s/David W. Bate</u>
                              Attorney for Defendant
                              Fed. Bar No. 2096
                              15 Columbia Street, Suite 301
                              Bangor, Maine  04401
                              (207) 945-3233
                              davebate@gwi.net